Judgment rendered April 10, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,492-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

CODY DOUGLAS BAGWELL                    Plaintiff-Appellee

versus

SUSAN BROOKE BAGWELL                    Defendant-Appellant

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Lincoln, Louisiana
Trial Court No. 60,573

Honorable Thomas Rogers, Judge

* * * * *

PROLIFIC LITIGATION GROUP, LLC          Counsel for Appellant
By: Krystal J. Williams

HUDSON, POTTS & BERNSTEIN, LLP          Counsel for Appellee
By: Jan P. Christiansen, III

* * * * *

Before PITMAN, THOMPSON, and MARCOTTE, JJ.

**MARCOTTE, J.**

This appeal arises from the Third Judicial District Court, Parish of Lincoln, the Honorable Thomas W. Rogers presiding. Appellant, Susan Brooke Bagwell, appeals the trial court's ruling dismissing with prejudice her petition for protection from abuse from appellee, Cody Douglas Bagwell. For the following reasons, we affirm the trial court's ruling.

### FACTS AND PROCEDURAL HISTORY

The following facts are taken from the trial court's February 8, 2022, ruling on a motion to modify custody, an amended motion to modify custody, and rules for contempt filed by Cody Douglas Bagwell ("Cody") and illustrate the contentious history between the parties. Cody and Susan Brooke Bagwell ("Brooke") were married with two minor children, a son, L.B. (DOB: 5/31/2015), and daughter, A.B. (DOB: 9/15/2017). On August 23, 2019, Cody filed for divorce under La. C.C. art. 103(2), alleging Brooke had committed adultery.

On December 11, 2019, the trial court signed an order of protection in favor of Brooke against Cody. On December 19, 2019, the court orally granted the parties divorce on the basis of Brooke's adultery.[1] The protective order was renewed on December 12, 2019, and January 14, 2020. On February 21, 2019, the protective order was dismissed by joint motion of the parties. The original petition for custody alleged eight instances of abuse, which the trial court listed in its February 8, 2022, ruling as (verbatim)[2]:

---

[1] On June 11, 2020, the trial court signed a judgment of divorce.

[2] These were, presumably, Brooke's allegations against Cody.

(1) December 5, 2019 (hair pulling incident);

(2) November 11, 2019 (puppy drop off);

(3) August 17, 2019 (confession of affair);

(4) October 7, 2018 (missed flight-visible handprint on arm);

(5) No date given (argument regarding college for Kyla-hair pull)[3];

(6) August 18, 2017 (pillow over head);

(7) June 8, 2017 (drink cup spilled in truck-"skullfuck your head"); and

(8) March 23, 2017 (camping trip-headbutt)

On January 27, 2020, the court ordered a custody evaluation by Dr. Candi Hill ("Dr. Hill"). On June 11, 2020, a judgment of divorce was signed. On November 6, 2020, a consent judgment was signed in which the parties agreed to share custody of their children on a two-week alternating schedule. The consent judgment stated that by entering into the judgment, neither party was accepting or adopting the report prepared by Dr. Hill and they reserved the right to dispute anything in the report.

On May 13, 2021, Cody filed a motion to modify custody and a rule for contempt alleging Brooke failed to comply with the November 6, 2020, consent judgment and custody plan in that she:

(1) failed to pay her half of daycare expenses;

(2) failed to allow L.B. to participate in T-ball while Cody was away at work despite him arranging transportation for L.B.;

(3) intercepted calls between Cody and their children, during which she cursed at Cody and called him names in their presence; and

---

[3] Kyla is Brooke's child from a previous marriage.

(4) thwarted the relationship between Cody and their children. Cody stated that the children were disrespectful and withdrawn towards him while in Brooke's presence, but acted differently when Brooke was not around.

Cody's motion to modify custody also referred to Dr. Hill's report alleging that Brooke was diagnosed with antisocial personality disorder and other disorders and that she failed to comply with an investigation conducted by the Department of Children and Family Services ("DCFS") regarding possible sexual abuse of A.B. Cody also alleged that after testing positive for COVID, Brooke took L.B. to school and A.B. to daycare. He further asserted that Brooke falsely claimed that he had sexually abused A.B. He also contended that Brooke said things that made him question her mental health, such as:

(1) the trial court made money believing it had "the authority to sever what God joined together and other disrespectful things";

(2) the court threw money at Dr. Hill to get the result it desired;

(3) the show *Dexter* predicted the Evergreen ship would block the Suez Canal;

(4) the show *The Simpsons* also predicted the future; and

(5) the earth is flat.

On June 14, 2021, Cody filed an amended motion to modify custody and a rule for contempt alleging additional statements that Brooke made which showed her deteriorating mental health. The trial court said that the only additional statement consisted of Brooke believing the legal system and healthcare system were corrupt. The trial court stated that the eight examples of mental health issues were already discussed, and the trial court noted that many parents involved in custody disputes voiced frustrations with the legal process. The court stated that at that point Brooke had not

3

made any claims of sexual abuse to DCFS and that the investigation was triggered by a mandatory report made by the owner of A.B.'s daycare facility, Lily Wade ("Wade"), who informed Brooke of the investigation.

The trial court also stated that Brooke "failed to follow through" on therapy for L.B. and "the presence of Randall Adkins in Brooke's home." The trial court noted that L.B. had eight unexcused absences from school; her explanation for the absences was that she kept him home from school so that Cody could not see him while law enforcement investigated the abuse allegations against Cody. On September 13, 2021, Cody filed a third rule for contempt.

The trial court then discussed Dr. Hill's report and addendum. Dr. Hill originally recommended a shared custody plan similar to that found in the consent decree. Dr. Hill provided an addendum to her original report, dated two weeks later, which included information provided by Cody with no involvement from Brooke. Dr. Hill testified that she was unable to contact Brooke, but there was no information about whether Dr. Hill was able to contact Brooke's attorney. The trial court noted that Brooke changed lawyers between the dates of Dr. Hill's original report and the addendum. The trial court said that the addendum and Dr. Hill's testimony raised concerns about Brooke continuing to share custody.

However, the trial court said that most of Dr. Hill's conclusions in her testimony and addendum were based on a "very one-sided set of facts" provided by Cody without input from Brooke. The court noted that it had not ordered Dr. Hill to provide an addendum, and the doctor's failure to include any input from Brooke was "suspect." The trial court said that Dr.

4

Hill should have advised it that she could not provide the court with an "objective update," and the court would not consider the addendum or Dr. Hill's testimony in its ruling.

The trial court then discussed the alleged sexual abuse. First, the court stated that it found the timing of Cody's May 13, 2021, motion to modify custody suspicious. The court said that it came shortly after he and Brooke "broke off their adulterous relationship"[4] and after Wade reported A.B.'s troubling behavior at daycare. The trial court said that there was no evidence that Brooke made the accusation between the consent judgment and when Cody filed his motion to modify custody; her accusations came several months later. Wade testified to specific instances of "alarming behavior" by A.B. that could be indicative of sexual abuse. The DCFS investigation found nothing confirming that A.B. was sexually abused and the agency successfully objected to providing any evidence regarding its investigations. The trial court then said, "Cody's timing raises the question if the May 13th motion was an attempt to preempt the investigation."

The trial court stated that there were other instances of disturbing behavior by A.B. that occurred after May 13, 2021. Lynn Albritton ("Albritton") was Brooke's supervisor and a registered nurse who had personal experience with sexual abuse. She was concerned about A.B.'s behavior which she expressed to Brooke. Albritton testified about the following behavior from A.B., which raised concerns about possible sexual abuse, consisting of:

---

[4] Cody remarried after his divorce from Brooke, but the two continued to have a sexual relationship thereafter.

(1) September 24, 2021: A.B. scratched her bottom, smelled her finger, and said that Cody "had done this to her";

(2) September 7, 2021: L.B. told A.B. to sit on his head; and

(3) October 7, 2021: A.B. told her dolls to "smell each other's crotch."

Kyla also testified to witnessing A.B. try to stick a brush handle "up her butt" in July or August 2021. Brooke initiated a report based on suspicions that Cody or his parents had sexually abused A.B. The trial court said that law enforcement investigated the matter and no one had been charged at the time of the trial court's ruling. The court stated that Brooke had a legitimate reason to be concerned that inappropriate behavior was occurring and that Cody or other family members were the perpetrators. However, the court said that it had "no explanation for [A.B.'s] troubling behavior and [couldn't] find evidence of sexual abuse."

The trial court then stated:

> Almost all of the allegations made in each of the three motions filed by Cody as to a "material change in circumstances" were either completely unproven or there was insufficient evidence presented to carry the burden of proof. This was discussed separately under each motion. The one area where there is any real argument to be made otherwise is Brooke's use of the allegations of sexual abuse against Cody. Was this done to justify withholding the children from Cody and to alienate the children from Cody? Was this done by Brooke when she knew no abuse had taken place? Has this also damaged the lines of communication between the parties so as to constitute a "material change in circumstances?" For the sake of argument, the court will consider this a "material change in circumstances" and move on to the best interests of the children.

The trial court then considered the factors found in La. C.C. art. 134. With regard to La. C.C. art. 134(1), the potential for the children to be abused, the court said:

6

This issue is very troubling for this court. There are number of credible instances where the suspicious behavior of [A.B.] would cause a reasonable person to inquire as to the possibility of sexual abuse. This was investigated by various authorities and no action was taken. There were also numerous allegations of physical abuse by Cody against Brooke, which all occurred prior to the consent judgment. Three of these had corroborating evidence in the form of third-party testimony. This factor favors Brooke.

The following are other factors from La. C.C. art. 134 that the trial court considered which are pertinent to this appeal. The court stated:

(7) The moral fitness of each party as it affects the children

The morals of both parties are equally deplorable. Both of their explanations for maintaining sexual relations after Cody's remarriage lacked credibility. They have what has been described as a toxic relationship by several witnesses. This undoubtedly affects the welfare of the children, as well as Cody's second marriage to Tiffany Bagwell. This factor favors neither parent.

(8) History of substance abuse, violence, or criminal activity of either party

The court's concerns regarding the physical abuse of Brooke by Cody, which occurred prior to the consent judgment, would weigh in favor of Brooke. As for the past criminal activity of either party, the only charges were Cody's two charges of driving while intoxicated, which occurred too long ago to be considered. There was some discussion of possible alcohol problems for Cody, but nothing rose to the level of concern for the court and it was not proven to be an issue.

(9) The mental and physical health of each party

The court is not aware of any issues with regard to the physical health of either party. The mental health of each party was described in Dr. Hill's original report and it slightly favored Cody. However, it is obvious that both have mental health issues which need to be addressed.

Regarding La. C.C. art. 134(12), the willingness and ability of each party to facilitate and encourage a close relationship between the children and the other parent, the court said that it was possible that Brooke took

7

advantage of the sexual abuse allegations as a pretext for denying Cody his rights. The court said that the reports of A.B.'s troubling behavior were credible enough to justify an investigation and Wade's report of potential abuse came about without Brooke's influence. The court said the later reports of abuse had some third-party corroboration, "but it is possible that Brooke overreacted in making them, especially in light of her previous history of dealing with sexual abuse." The court noted that Brooke had an excellent relationship with Kyla's father and stepmother, and the three worked well together to raise Kyla.

The court reiterated its suspicions about the timing of Cody's first motion to modify custody, the lack of evidence he presented with regard to most of the allegations in his motions, and the trivial nature of some of the allegations. The court said that Cody continued his sexual relationship with Brooke after he remarried, which contributed to the fact that Brooke considered his new marriage to be illegitimate based on her religious beliefs. The court stated that Cody's rush to file the motion to modify custody demonstrated a hostility that was not conducive to facilitating a relationship between Brooke and the children. The court then concluded that "due to the toxic and contentious relationship between the parties, the factor favors neither of the parties."

The court stated that both parties were "deeply flawed" and in need of counseling. The court determined that it could find no reason to modify the November 6, 2020, shared custody plan. The court did find it necessary to add additional conditions of custody, requiring that: (1) the parents complete parenting classes; (2) Cody complete a domestic abuse program; and (3)

Brooke complete a dialectical behavior therapy program. On March 21, 2022, the trial court signed a judgment denying Cody's motion to modify custody, amended motion to modify custody, and his three rules for contempt.

On January 17, 2023, Brooke filed a petition for protection from abuse in the Fourth Judicial District Court in Ouachita Parish. She alleged that in December 2022, Cody punched L.B. in the abdomen, which resulted in a diagnosis of traumatic ecchymosis (bruising) of the abdominal wall. Brooke also stated that A.B. reported to her that Cody stuck his finger in her anus, which was evidenced by "redness excoriation to the anus and [a] diagnosis of [a] bladder infection with limited ability to close legs."[5] Brooke said that both incidents were discovered when the children returned to her custody. Brooke stated that there were two past reports to DCFS of sexual abuse of A.B. which were investigated by DCFS and law enforcement. On the same day, the Fourth Judicial District Court granted a temporary restraining order ("TRO") against Cody which was effective through February 3, 2023.

Incomplete medical records were attached to the petition for protection from abuse for L.B. and A.B. The medical records indicated that both were seen at St. Francis Medical Center ("St. Francis") on January 2, 2023. The medical records stated that L.B. had a small area of ecchymosis (bruising) on the left side of his abdomen, with no tenderness, and noted that he was eating, drinking, and behaving normally. A.B.'s medical records, also dated January 2, 2023, showed that she had a "mild erythema around

---

[5] Brooke was employed as a nurse and was familiar with medical terminology.

9

perianal that tracks toward the vagina," meaning A.B. had redness around her anus. The medical records that were attached to Brooke's petition were missing pages. Page four of A.B.'s records was missing, but the top of page five stated, "[F]actually correct, but she continues to accuse staff of lying. Given Rx for UTI and follow up info for assault work up. Discharge at this time as the patient has a safe place to stay." A.B.'s diagnosis was alleged sexual abuse and acute cystitis without hematuria, meaning she had a bladder infection without blood in her urine.

On February 1, 2023, Cody filed an *ex parte* motion to transfer based upon forum *non conveniens* and exception of improper venue. The Fourth Judicial District Court extended the TRO through February 17, 2023; the court extended the TRO a second time until February 24, 2023. On February 16, 2023, the court granted the motion to transfer the case to the Third Judicial District Court in Lincoln Parish.

On February 24, 2023, a hearing was held at the Third Judicial District Court. The trial court first stated that it would not consider anything prior to its March 21, 2022, ruling, because it was not relevant and had already been litigated. The children were present in the courtroom, and the trial court had them escorted out. Brooke asked that the case be continued until the Lincoln Parish Sheriff's Office ("LPSO") concluded its investigation. Cody countered that he was informed by the police that no charges would be brought and the case was closed. Brooke argued that the investigating officer was waiting for the final report from DCFS before closing the case, so it was technically still open. She stated that the police investigation was flawed, because the police told St. Francis not to perform a

SANE exam[6] on A.B.  The trial court denied the continuance saying, "I've already heard these kind[s] of unsubstantiated claims before and I didn't find any validity to any of these claims.  It seems like it's based totally on what [Brooke] has to say.  She can testify and I'll make the decision."  Brooke objected.

Brooke testified, and at the outset of her testimony, the trial court limited her testimony to events that occurred after March 21, 2022, and to what was in her petition for a protective order.  Brooke stated that Cody returned L.B. and A.B. to her custody a day early on January 31, 2023.[7]  It was a weekend, which is when Brooke works, so her mother was watching the children.  Brooke's mother called her at work saying that L.B. was crying and complaining about a stomachache and headache.  Brooke advised her mother to give L.B. Tylenol and to call her back if he did not calm down.  Her mother called again about one hour later saying L.B. was still upset and in pain.  She told her mother to give L.B. Motrin; she did and L.B. then went to sleep.

Brooke stated that she returned home from work around 11:45 p.m. that evening.  A.B. was on the couch; Brooke went to pick her up, and A.B. would not put her legs around her mother's waist.  Brooke said she was "guarded and clenching," like her legs were stiff.  Brooke asked what was wrong and A.B. said she did not want to talk about it.  The next day, Brooke had A.B. in the bath, and when the child went to sit down, she started screaming and saying her butt hurt.  Brooke asked A.B. what happened to

---

[6] A SANE exam refers to an exam performed by a Sexual Abuse Nurse Examiner.

[7] This date is likely in error, given that Brooke took the children to St. Francis on January 2, 2023, and filed a protective order on January 17, 2023.

her bottom, and she replied, "Daddy stuck [his] finger in my butt again."
The trial court asked if that was the first time A.B. reported something similar to Brooke, and she said it was not.

Brooke examined A.B.'s bottom and stated that it looked "excoriated and red." Brooke testified that A.B. then disclosed to her that Cody punched L.B. in his stomach while the children were with him. Brooke then examined L.B.'s abdomen and saw a bruise on his left side. Brooke testified that L.B. told her that Cody had punched him. Brooke said that she spoke with two therapists about the matter and they advised her to take the children to the hospital. The children were assessed at St. Francis, and the hospital staff called the LPSO. Brooke agreed to a SANE exam, but the nurse returned and said that the LPSO did not want a SANE exam performed, because they wanted to speak with A.B. first and questioned whether the exam was in A.B.'s best interest given her UTI diagnosis. Brooke stated that A.B. was diagnosed with a bladder infection and redness around her anus. She testified that A.B. had never had a bladder infection or UTI before.

The complete medical records for both children were admitted. They confirmed A.B.'s diagnosis of a UTI and L.B.'s diagnosis of having a bruise on his abdomen. Dr. Lee Shelton examined A.B. and provided the following pertinent notes:

> 20:28 Physical exam on patient genital area not done at this time. SANE contacted and awaiting further plans before examining patient.

> 21:40 Adult male in room accuses hospital staff of protecting sexual predators because we will not override police plan for SANE exam.

> 22:40 Patient's mother [continues] to berate staff when informed patient's urine was consistent with a UTI and the rash she has could be worsened because of it, mother accuses this doctor of lying to her because "little girls do not get UTI's." Informed mother that this is not factually correct, but she continues to accuse staff of lying. Given Rx for UTI and follow up info for assault work up. Discharged at this time as patient has safe place to stay.

Brooke testified that she had a conversation with the doctor about not performing the SANE exam at St. Francis when A.B. was first seen which "got heated." Brooke said that she knew that A.B. not having a SANE exam and taking antibiotics for her bladder infection could have skewed the evidence. She said that the doctor told her bladder infections were common in children; she disagreed. Brooke said that the doctor did not call the police or threaten to do so during their discussion. She testified that a SANE exam was performed on A.B. about two weeks later.

Brooke next discussed L.B.'s visit to St. Francis. She said that L.B. was examined, x-rayed, and diagnosed with traumatic ecchymosis, which she described as "internal bleeding." Both children were discharged. DCFS later questioned the children. DCFS asked Brooke to provide information about prior incidents of abuse, which she did. DCFS stated that further investigation would be required and she set up the SANE exam for A.B. Brooke said she was informed that Cody was brought in for questioning. Brooke testified that the investigating detective told Brooke that there was no finding of abuse of A.B. or L.B. Brooke stated that A.B. continues to stick objects up her rectum and still has accidents where she urinates on herself. Brooke said that A.B. "talks like a baby" and "regresses."

The trial court orally denied the petition for protection from abuse and assessed court costs to Brooke. The court said that an investigation by law

13

enforcement did not uncover any instances of abuse of either child and their

medical records did not show any abuse. The court said that Brooke

testified that A.B. inserts objects into her rectum, which could have caused

her urinary tract infection. Brooke objected to the dismissal. The parties

then discussed when Cody could get custody of the children, as he had not

seen them for approximately six weeks at that point and custody was due to

revert to Brooke a few days after the hearing. Brooke's counsel objected to

Cody having custody for more than a few days, saying that Brooke should

not have been penalized for the length of the investigation into the alleged

abuse. The court responded:

> [T]he filing of the petition in Ouachita Parish is a real problem
> for me. I view that as a way to circumvent the order of this
> court to try to get a different result. I find that to be in bad
> faith. I'm not [going] to reward bad faith with her getting her
> way for two months now.

Brooke objected. Cody informed the court that Brooke had removed

the children from school for about two weeks prior to the hearing and that he

was planning to reenroll them in school. The court told Brooke that Cody

was the domiciliary parent over the children's education and that she needed

to abide by his school choice.

On the same day as the hearing, the trial court signed a judgment

dismissing with prejudice the petition for protection of abuse. Brooke now

appeals.

## DISCUSSION

*Prior Allegations of Abuse*

In her first assignment of error, appellant argues that the trial court

should have considered past abuse in making its ruling. Brooke states that

14

La. R.S. 46:2135(A) mandates that courts consider any and all past history of abuse in determining the existence of an immediate and present danger of abuse. Brooke argues that such legal error makes the manifest error standard of review no longer applicable, and this court should review this case under a *de novo* standard. She contends that, because the law requires any history of abuse to be considered, she was not required to include every prior allegation of abuse against the children in her petition, and doing so deprived her of her substantial rights.

Cody contends that because the prior allegations of abuse in this case had been litigated and rejected, the trial court was correct in refusing to allow Brooke to raise those issues again at the hearing. Appellee contends that the trial court considered the prior allegations of abuse, because Judge Rogers presided over the trial on the motion to modify custody and the amended motion to modify custody in 2021. Therefore, the court did not have to relitigate those allegations.

An appellate court reviews domestic orders for an abuse of discretion. *Shipp v. Callahan,* 47,928 (La. App. 2 Cir. 4/10/13), 113 So. 3d 454. The trial court sitting as a trier of fact is in the best position to evaluate the demeanor of the witnesses, and its credibility determinations will not be disturbed on appeal absent manifest error. *Modicue v. Prince of Peace Auto Sale, LLC*, 54,095 (La. App. 2 Cir. 9/22/21), 328 So. 3d 1239, *writ denied*, 21-01864 (La. 2/15/22). In addition, as to evidentiary issues, a trial court is granted broad discretion in its rulings on evidentiary issues which will not be disturbed on appeal absent a clear abuse of that discretion. *Succession of*

15

*Moore*, 54,338 (La. App. 2 Cir. 3/30/22), 339 So. 3d 12, *writ denied*, 22-00973 (La. 10/4/22), 347 So. 3d 859.

Here, Brooke argues that the trial court committed a legal error in not considering the prior abuse allegations. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. *State in Interest of D.E.*, 52,305 (La. App. 2 Cir. 8/15/18), 253 So. 3d 877. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. *Id*. When a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts *de novo*. *Id*. However, as long as the trier of fact's findings are reasonable in light of the record as a whole, the appellate court will affirm. *Id*.

In order to reverse a ruling on a protection order, the appellate court must review the record in its entirety and conclude that a reasonable factual basis does not exist for the finding and the factfinder is clearly wrong or manifestly erroneous. *Carrie v. Jones*, 21-0659 (La. App. 4 Cir. 1/21/22), 334 So. 3d 834.

La. R.S. 46:2135 provides that upon good cause shown in an *ex parte* proceeding, the court may enter a temporary restraining order as it deems necessary to protect from abuse the petitioner, any minor children, or any person alleged to be an incompetent. Any person who shows immediate and present danger of abuse shall constitute good cause. The court shall consider any and all past history of abuse, or threats thereof, in determining the

existence of an immediate and present danger of abuse. There is no requirement that the abuse itself be recent, immediate, or present. The standard found in La. R.S. 46:2135 also applies to protective orders. La. R.S. 46:2136.

The trial court is required to consider any and all past history of abuse in making its ruling on a protective order. However, the trial judge in the instant case presided over the proceedings about modifying the parties' custody arrangement. The court was familiar with the past allegations of abuse as it detailed in its February 8, 2022, ruling on Cody's motion to modify custody, amended motion to modify custody, and rules for contempt. The trial court noted in the reasons for its ruling that the past allegations of sexual abuse had been investigated by DCFS and the police and no charges were filed. The trial court went to great lengths in its ruling on modifying custody to detail the sexual abuse allegations and the antagonistic history between Brooke and Cody. We also note, there was no past history of physical abuse of L.B.

We do not find the trial court committed legal error by limiting the hearing on the protective order to the most recent allegations of sexual abuse, since the court was so well acquainted with the prior accusations. The court's February 8, 2022, ruling and minutes from the related hearings show that it thoroughly considered the evidence presented by the parties, including third-party testimony, and determined that there was no substance to the allegations.

We cannot say that the trial court's refusal to hear Brooke's testimony about prior allegations of abuse materially affected the outcome and

deprived her of substantial rights in such a way that amounted to prejudice. As discussed in the next section, we find that there was a reasonable basis for the trial court's dismissing Brooke's petition for protection of abuse. This assignment of error lacks merit.

*Dismissal of the Petition for Protection from Abuse*

In her second assignment of error, appellant argues that the evidence presented during the hearing on the protective order was sufficient to find under the preponderance of the evidence standard that a protective order was warranted. Brooke points out that no contradictory evidence was presented by Cody. Appellant asks this court to reverse the trial court's ruling dismissing her petition for protection from abuse and grant her petition.

Appellee argues that Brooke failed to provide any evidence that he abused the children, and she was unable to prove by a preponderance of the evidence that any abuse occurred. He states that her claims were investigated by the LPSO, which said that there was no abuse. He points out that Brooke admitted that she was told by the LPSO that there was no evidence of abuse. Appellee states that when hospital staff tried to explain to Brooke that there was another explanation for A.B.'s symptoms besides sexual abuse, she "became irate with the staff and berated them." Cody also points out that Brooke failed to have someone from DCFS or the LPSO testify. Appellee asks that this court affirm the trial court's ruling.

Under the Domestic Abuse Assistance Act, a court may issue a protection order pursuant to La. R.S. 46:2131 *et seq.* The intent of the Act is to provide a civil remedy of immediate and easily accessible protection to endangered persons from domestic abuse. *Shipp v. Callahan, supra.* La.

18

R.S. 46:2135 and 46:2136 require that there be "good cause shown" for the issuance of a protective order. "Good cause shown" is defined in La. R.S. 46:2135 as a showing of "immediate and present danger of abuse." Additionally, domestic abuse includes, but is not limited to, physical or sexual abuse or any offense against the person as defined in the Louisiana Criminal Code, except negligent injury and defamation, committed by one family member or household member against another. La. R.S. 46:2132(3). The court may grant a protective order to bring about a cessation of abuse of a party. La. R.S. 46:2136(A).

A party seeking a protective order under the Act must establish the necessary facts by a preponderance of the evidence. *Rozelle v. Rozelle*, 54,685 (La. App. 2 Cir. 8/10/22), 345 So. 3d 501. Proof is sufficient to constitute a preponderance of the evidence when the entirety of the evidence, both direct and circumstantial, establishes that the fact or causation sought to be proved is more probable than not. *Talbot v. Talbot*, 03-0814 (La. 12/12/03), 864 So. 2d 590; *State in Interest of A.H.*, 51,053 (La. App. 2 Cir. 9/28/16), 206 So. 3d 1081, *writ denied*, 16-2017 (La. 1/9/17), 214 So. 3d 867.

The trial court was correct in determining that Brooke did not meet her burden of proving that a protective order was warranted in this case. The trial court found it in bad faith, and we agree, that Brooke filed her petition for protection from abuse in Ouachita Parish instead of Lincoln Parish, where the trial court was familiar with her case.

We also find it concerning that the medical records that were attached to the petition for the TRO filed in Ouachita Parish were incomplete and

19

were missing certain pages which provided more information about A.B.'s diagnosis and Brooke's dispute with the hospital staff regarding that diagnosis and refusal to perform a SANE exam. The complete medical records show that A.B. was examined by the medical professionals at St. Francis, and she was diagnosed with a UTI, which was the cause of her pain. Brooke also testified that A.B. continued to try to insert objects into her rectum, which, as the trial court noted, made her more susceptible to suffer a UTI and explained the redness to her anus. Brooke refused to accept A.B.'s diagnosis. It does not appear from the record that the trial court in Ouachita Parish, who granted the TRO and its extensions, was informed of the interaction between Brooke, her unnamed male friend, and the hospital's staff, because Brooke provided them with piecemeal medical records.

L.B.'s medical records stated that he had a bruise on his abdomen, and the only evidence Brooke provided of alleged abuse was her testimony that L.B. said that his father hit him. Brooke testified that both of her children were examined by medical staff at St. Francis and interviewed by DCFS and the LPSO. The medical records from St. Francis did not show staff concern that the children had been abused, but only documented what Brooke told them. Brooke testified that the LPSO was not going to bring charges against Cody. Brooke did not have anyone from DCFS or the LPSO testify. She also did not have her mother testify about L.B.'s symptoms prior to his allegedly disclosing to Brooke that his father hit him.

The parties have what was described by multiple witnesses and the trial court as a "toxic relationship." That toxic relationship has led both parties to make allegations against the other, and the trial court and this court

20

do not believe what Brooke most recently alleged amounted to abuse warranting a protective order.  Brooke did not meet her burden and the trial court's findings were reasonable in light of the record as a whole.  This assignment of error lacks merit, and the trial court's ruling should be affirmed.

## CONCLUSION

The trial court's ruling dismissing with prejudice Susan Brooke Bagwell's petition for protection from abuse is affirmed.  Costs of the appeal are assessed to the appellant.

**AFFIRMED.**